# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

PATRICE WILSON,

     Plaintiff,

v.

UNITED STATES OF AMERICA,

     Defendant.

Civil Action No.
1:19-cv-05120-VMC

## OPINION AND ORDER

The Court held a bench trial in this quiet title action on August 17, 2022. Frank G. Podesta of FGP Law, LLC appeared for Plaintiff Patrice Wilson. Jeremy A. Rill, United States Department of Justice - Tax Division appeared for Defendant United States America (the "Government"). The Court heard testimony from Donald Wilson, Michael Larkin, and Plaintiff Patrice Wilson, and the parties stipulated to certain facts (Stipulations, Pretrial Order Attach. C ("Stip."); Doc. 54) and the admission of Joint Exhibits ("J.E.") 1 through 19. After the trial, the Court took the matter under advisement. This Opinion and Order constitutes the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a).

For the reasons that follow, the Court finds for the Plaintiff. Judgment will enter accordingly.

### Findings of Fact

Patrice Wilson and Donald C. Wilson have been married for forty-three years as of the trial date. (Stip. ¶ 4; Transcript of Aug. 17, 2022 Bench Trial ("Tr.") 13:21–23, Doc. 64). Since the time of their marriage, they have maintained separate finances, including bank accounts. (Tr. 35:7–11).

For several years of their marriage, Mr. Wilson served in the United States Army. (*Id.* 14:3–4, 8). However, after he became disabled and left the service, the two moved to Georgia. (*Id.* 14:13–25).

Mr. Wilson purchased certain real property in Fayetteville, Clayton County, Georgia (the "Property") on July 27, 2000. A Warranty Deed transferring the Property to Donald Wilson on July 27, 2000, at a sale price of $194,900, is recorded in the public records of Clayton County at Book 4483, Page 321. (Stip. ¶ 4; J.E. 1).

In connection with the purchase of the Property, Mr. Wilson executed a Security Deed for a $155,920 mortgage in favor of Decision One Mortgage Company, LLC. (J.E. 2). The mortgage was a variable rate mortgage. (Tr. 16:4–12). Having never owned a home before, Mr. Wilson apparently did not fully understand the implications of the variable rate on the affordability of the loan. (*See id.*).

At the time, Mr. Wilson made all of the mortgage payments from his bank account and paid for all of the expenses on the property. (Tr. 35:24–36:3). In 2001,

after speaking with an estate planning attorney, Mr. Wilson transferred the Property into a trust, the Sawgrass Land Trust (the "Trust"), Donald Wilson Trustee. (J.E. 3; Tr. 16:21–17:5). Mr. Wilson testified that it was his understanding that "through that estate planning to put the house in a trust, it would probably be the safest way to pass that trust to your children." (Tr. 17:2–4).[1] He and his wife still lived in the property while it was held by the Trust and he continued to make the mortgage payments and pay expenses relating to the Property. (*Id*. 37:4–112).

Later, in 2003, the interest rate on Mr. Wilson's adjustable-rate mortgage began to rise and became unaffordable, necessitating a refinance. (*Id.* 17:11–19). As part of the April 15, 2003 refinance transaction, the Property was transferred back to Mr. Wilson, who obtained the refinance loan from MERS on behalf of lender Southstar Funding, LLC in the amount of $188,000, and then was transferred back into the Trust, all on the same day. (J.E. 4–6; Tr. 17:20–25). Mr. Wilson was the one who managed this process, not his wife. (Tr. 38:7–9).

The refinance mortgage was also an adjustable-rate mortgage, and it soon became unaffordable again. (*Id.* 18:1–14). Eventually, Mr. Wilson was unable to make the mortgage payment any longer, and the house went into foreclosure. (*Id*.). Mr. Wilson tried to refinance again but could not do it. (*Id.* 18:21–23).

---

[1] No evidence of any other alleged purpose for putting the property into the trust (such as creditor avoidance) was presented at trial.

To stave off foreclosure, Mr. Wilson arranged to have Michael Larkin, someone he knew through a friend, purchase the Property as a favor. (*Id.* 19:2–5; 39:13–15). The purchase price was based on an appraisal done by the bank. (*Id.* 40:1–5). Mr. Wilson attended the closing. (Tr. 41:24–25). The settlement statement provided that Mr. Larkin would contribute approximately $9,500 at closing, but Mr. Wilson testified that he did not give Mr. Larkin any money to help purchase the property and Mr. Larkin testified that he did not pay anything at closing. (J.E. 10 at 2; Tr. 42:4–5; 65:24–66:7). The settlement statement also provided that a little more than $75,000 would go to Mr. Wilson at closing, and that amount went into his bank account. (J.E. 10 at Tr. 42:6–16). He did not pay any of it to Mr. Larkin. (Tr. 66:8–16). A Warranty Deed transferring the Property to Michael Larkin on June 16, 2006, at a sale price of $269,000, was recorded in the public records of Clayton County at Book 8698, Page 190. (Stip. ¶ 6; J.E. 7, 10).

While the mortgage was in Mr. Larkin's name, Mr. Wilson made the payments on the mortgage and paid other expenses related to the Property, to the exclusion of Mr. Larkin. (Tr. 19:10–13; 43:14–22). However, even despite Mr. Larkin's good credit, he was also put into a variable rate mortgage. (*Id.* 19:20–25). In 2012, the mortgage payment increased again, and the Wilsons were again unable to afford it, soon facing foreclosure. (*Id.* 20:14–18).

4

Mr. Wilson tried unsuccessfully to get another loan through USAA (*Id.* 20:21–25), and the Wilsons began preparing to move. (*Id.* 20:19). But before they did, they decided to see if Mrs. Wilson could qualify. (*Id.* 21:3–8). The Wilsons were referred to a realtor who arranged a short sale of the property from Mr. Larkin to Mrs. Wilson. (*Id.* 46:18–47:10).[2] Mr. Larkin testified that Mr. Wilson approached him with the idea. (*Id.* 68:17–18).

As part of the closing, Mr. Wilson signed a letter stating that he would provide $5,000 toward closing as a gift. (*Id.* 22:24–23:16; J.E. 8).  Mr. Wilson testified that he did not think Mrs. Wilson ever actually used the money, but that the bank prepared the letter because Mrs. Wilson was not able to access her 401(k) in time to close with the pendency of the foreclosure. (Tr. 23:3–14, 24:3–7). Mr. Wilson also provided an explanation letter for the source of funds stating that his income came from selling weight-loss milkshakes. (*Id.* 23:3–16; J.E. 9).

Mr. Wilson further testified that he did not attend the closing, and that Mrs. Wilson went by herself. (Tr. 23:12–14). Mr. Wilson testified that the bank handled everything, including the appraisal. (*Id.* 24:10). Mrs. Wilson paid the $110,000 purchase price with a mortgage, this time at a fixed rate (*Id.* 78:5–11; Stip. ¶ 7). A Warranty Deed transferring the Property to Patrice Wilson on March 28, 2013 is

---

[2] There appeared to be confusion by both of the Wilsons about whether they were purchasing the property from the bank or at a short sale, but the deed in question was from Mr. Larkin. (*E.g.* Tr. 77:1–21).

recorded in the public records of Clayton County at Book 10308, Page 068. (Stip. ¶ 7; J.E. 11).

After Mrs. Wilson purchased the property, she paid the mortgage using funds from her bank account. (Tr. 24:22–24, 25:3–7). Somewhere around 2015, Mr. Wilson received a lump sum disability award between $110,000 and $120,000. (*Id.* 26:1–11). He used that money to make about $40,000 in improvements to the Property between 2015 and 2017. (*Id.* 27:14–19; *see also* J.E. 13–19). Mr. Wilson did not obtain his wife's permission before making the repairs. (Tr. 59:17–23). Mrs. Wilson testified that he wanted to surprise her. (*Id.* 75:21–24).

Mr. Wilson also began making regular gifts of $1,500 per month from his ongoing disability payments to his wife. (Tr. 32:9–18; J.E. 12). He testified that it was not for the purpose of paying the mortgage or any other particular reason other than supporting his family. (*Id.*). The amount varied some months, but Mr. Wilson testified that there was no agreement to pay the amounts and that he never directed his wife to make payments with the money. (*Id.* 33:9–17). Mrs. Wilson also did upkeep and maintenance on the house, including repainting the house by hand and changing fixtures. (*Id.* 93:6–15). In the nearly ten years she has owned the house, Ms. Wilson has always paid the mortgage, the homeowners association fees, the property taxes, and the insurance. (*Id.* 79:16–20). She testified that while the Property is her house and her property, it is Mr. Wilson's home. (*Id.* 95:13–25).

Meanwhile, Mr. Wilson incurred federal income taxes through business activity for the years 2016 and 2017, which remain outstanding. (Stip. ¶ 1). Mr. Wilson's federal income tax liabilities for 2016 were assessed on or about February 19, 2018. (*Id.* ¶ 2). His federal income tax liabilities for 2017 were assessed on or about October 29, 2018. (*Id.* ¶ 3). Mr. and Mrs. Wilson filed taxes separately, including during all periods relevant to this case. (Tr. 22:6–7).

On July 8, 2019, the Government filed a Notice of Federal Tax Lien (the "Nominee Lien") against Mrs. Wilson, as Nominee of Mr. Wilson, for Mr. Wilson's 2016 Assessment and 2017 Assessment on the Property for a total alleged debt of $679,808.97 in the public records of Clayton County, Georgia, at Book 1477, Page 519. (*Id.* ¶ 8). Mrs. Wilson filed this quiet title action on November 12, 2019. (Compl., Doc. 1).

## Conclusions of Law

### I.   Legal Standards

#### A.   Quiet Title Actions

A property owner may bring a quiet title action against the United States. 28 U.S.C. § 2410(a) ("Under the conditions prescribed in this section and section 1444 of this title for the protection of the United States, the United States may be named a party in any civil action or suit in any district court, or in any State court having jurisdiction of the subject matter . . . (1) to quiet title to, . . . real or personal

property on which the United States has or claims a mortgage or other lien."). A property owner may challenge the procedural validity of a federal tax lien under Section 2410, but not the merits of the underlying assessment. *Stoecklin v. United States*, 943 F.2d 42, 43 (11th Cir. 1991).

Because Section 2410 "limits the sovereign immunity of the United States, it must be interpreted according to federal law . . . [however,] questions involving ownership, transfer and title to real estate have traditionally been resolved according to the laws of the state where the realty is located. *Amoco Prod. Co. v. United States*, 619 F.2d 1383, 1387 (10th Cir. 1980) (citing *Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 378-79 (1977); *United States v. Doyle,* 468 F.2d 633, 636 (10th Cir. 1972)). As the Property is located in Georgia, the parties agree that Georgia law is the relevant state law. *Cf. Amoco Prod. Co.*, 619 F.2d at 1387.

"Under [Georgia law], a party may seek to cancel 'any instrument which has answered the object of its creation . . . which, though not enforced at the time, either casts a cloud over the complainant's title or otherwise subjects him to future liability or present annoyance. . . .'" *Bank of Am., N.A. v. Garcia*, No. 1:16-CV-04762-JPB, 2019 WL 7484746, at *5 (N.D. Ga. Oct. 30, 2019) (citing O.C.G.A. § 23-3-40). As discussed further in Section I.D. of the Court's Conclusions of Law, below, "[t]o obtain relief, the movant must show that he cannot protect his rights in any other

way; the instrument sought to be canceled would cast a cloud on his title; and that he either suffers some present injury or needs to bring the action to preserve his rights." *Id.* (citing O.C.G.A. § 23-3-42).

### B.    Nominee Tax Liens

Under the Internal Revenue Code, Title 26, U.S.C. ("IRC"), the Government has a lien on the property of a person who fails to pay their taxes. Specifically, IRC § 6321 provides that

> [i]f any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person.

Under IRC § 6323, the IRS can perfect this lien against third parties by filing a notice of the federal tax lien. Ordinarily, the IRS will file a notice of tax lien on real property titled in the name of the taxpayer liable for the taxes. However, the Internal Revenue Manual ("IRM") specifies certain instances where it takes the position that it may file a notice of federal lien in property titled in the name of another person who is not also liable for the taxes. One such instance is that of property held by a "nominee" for the taxpayer.

> A "nominee" is someone designated to act for another. As used in the federal tax lien context, a nominee is generally a third-party individual who holds legal title to property of a taxpayer while the taxpayer enjoys full use

> and benefit of that property. In other words, the federal tax lien extends to property "actually" owned by the taxpayer even though a third party holds "legal" title to the property as nominee. Generally speaking, the third party in a nominee situation will be either another individual or a trust.

IRM § 5.17.2.5.7.2, 2007 WL 9243864, at *1 (Mar. 19, 2018). The IRM specifies that to "establish a nominee lien situation, it must be shown that while a third party may have legal title to the property, it is really the taxpayer that owns the property and who enjoys its full use and benefit." *Id.*

However, the Government's determination that a nominee lien situation exists is only the start of the inquiry. "The federal tax lien statute itself creates no property rights but merely attaches consequences, federally defined, to rights created under state law." *United States v. Craft*, 535 U.S. 274, 278 (2002). "Thus, courts 'look initially to state law to determine what rights the taxpayer has in the property the Government seeks to reach, then to federal law to determine whether the taxpayer's state-delineated rights qualify as 'property' or 'rights to property' within the compass of the federal tax lien legislation." *May v. A Parcel of Land* ("*May I*"), 458 F. Supp. 2d 1324, 1334–35 (S.D. Ala. 2006), *aff'd sub nom. May v. United States* ("*May II*"), No. 07-10531, 2007 WL 3287513 (11th Cir. Nov. 8, 2007) (quoting *Craft*, 535 U.S. at 278). As the Supreme Court wrote in *Craft* regarding this paradigm:

> A common idiom describes property as a "bundle of sticks"—a collection of individual rights which, in certain combinations, constitute property. . . . State law

10

> determines only which sticks are in a person's bundle.
> Whether those sticks qualify as "property" for purposes
> of the federal tax lien statute is a question of federal law.

535 U.S. 274, 278–79 (citing B. CARDOZO, PARADOXES OF LEGAL SCIENCE 129 (1928));

*see also Dickman v. Comm'r*, 465 U.S. 330, 336 (1984).

Common law jurisdictions generally recognize circumstances where someone other than the title holder of property is deemed to be the equitable owner of the property.[3] While the nomenclature may differ, "[i]t would be erroneous to focus on the label applied to the doctrine by [state] courts, as opposed to its substance." *May I*, 458 F. Supp. 2d at 1337 n.22. Instead, "federal appellate courts have deemed state law to bear on the nominee question even when the state courts have called it something else." *Id.* (citing *Spotts v. United States*, 429 F.3d 248, 253 (6th Cir. 2005) (constructive trust); *Scoville v. United States*, 250 F.3d 1198, 1202 (8th Cir. 2001) (fraudulent conveyance); *United States v. Stinson*, 386 F.Supp.2d 1207, 1218 (W.D. Okla. 2005) (fraudulent conveyance)).

---

[3] *See, e.g.*, RESTATEMENT (THIRD) OF TRUSTS § 7 (2003) ("A resulting trust is a reversionary, equitable interest implied by law in property that is held by a transferee, in whole or in part, as trustee for the transferor or the transferor's successors in interest."); RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 55(1) (2011) ("If a defendant is unjustly enriched by the acquisition of title to identifiable property at the expense of the claimant or in violation of the claimant's rights, the defendant may be declared a constructive trustee, for the benefit of the claimant, of the property in question and its traceable product.").

Where state law "fails to delineate a test for determining the 'real intent' of a title transfer between spouses," the Eleventh Circuit looks to "the common-law factors generally applied by federal courts to determine the existence of a nominee relationship" for guidance. *May II*, 2007 WL 3287513, at *2 (collecting cases).

> District courts in the Eleventh Circuit consider the following factors in determining whether property is being held by a nominee of the taxpayer: (1) whether the taxpayer exercised dominion and control over the property; (2) whether the property of the taxpayer was placed in the name of the nominee in anticipation of collection activity; (3) whether the purported nominee paid any consideration for the property, or whether the consideration paid was inadequate; (4) whether a close relationship exists between the taxpayer and the nominee; and (5) whether the taxpayer pays the expenses (mortgage, property taxes, insurance) directly, or is the source of the funds for payments of the expenses.

*United States v. Wilkins*, No. 8:14-CV-993-EAK-JSS, 2019 WL 12518510, at *18 (M.D. Fla. Feb. 26, 2019) (citing *United States v. Hounsom*, No. 6:14-CV-93-ORL-40DAB, 2015 WL 6152964, at *4 (M.D. Fla. Aug. 11, 2015); *United States v. Ippolito*, 838 F. Supp. 2d 1287, 1291 (M.D. Fla. 2012); *United States v. Dornbrock*, No. 06-61669-CIV, 2008 WL 769065, at *5 (S.D. Fla. Jan. 17, 2008), *aff'd*, 309 F. App'x 359 (11th Cir. 2009)). "Not all of the foregoing factors are of equal weight, and they should not be applied rigidly or mechanically, as no one factor is determinative." *Id.* (quoting *Dornbrock*, 2008 WL 769065, at *5). "The most critical issue is *who has substantial*

*control over the property.*" *Id.* (quoting *Dornbrock*, 2008 WL 769065, at *5) (emphasis in original).

### C.    Georgia Law on Implied Trusts

The Government points to Georgia's law on implied trusts as an analogue to nominee ownership. (Trial Br. United States at 5, Doc. 57) (citing *Ansley v. Raczka-Long*, 293 Ga. 138, 141 (2013)). Georgia law only recognizes two types of implied trusts: resulting trusts and constructive trusts. O.C.G.A. § 53-12-2(2); *Loggins v. Daves*, 40 S.E.2d 520, 521 (Ga. 1946) ("Implied trusts are either resulting or constructive."). The Georgia Supreme Court has explained the difference as follows:

> In an implied resulting trust the intention of the parties is an essential element, although no valid agreement setting up such an intention is shown, but such mutual intent is implied only from proven facts and circumstances. An implied constructive trust is different, in that here there is no intention of the parties to create such a relationship, but on the contrary in most, if not every case, such a trust arises by virtue of the fraudulent conduct of one misappropriating the money of another, and the trust arises contrary to any intent on his part.

*Loggins*, 40 S.E.2d at 521 (citing 4 POMEROY'S EQUITY JURISPRUDENCE, §§ 1031, 1044).

Georgia has codified the circumstances where implied trusts are available in O.C.G.A. Title 53, Article 7. A resulting trust is available in the following three situations "when it is determined that the settlor did not intend that the holder of

the legal title to the trust property also should have the beneficial interest in the property":

> (1) A trust is created but fails, in whole or in part, for any reason;
>
> (2) A trust is fully performed without exhausting all the trust property; or
>
> (3) A purchase money resulting trust as defined in subsection (a) of Code Section 53-12-131 is established.

O.C.G.A. § 53-12-130. "A purchase money resulting trust is a resulting trust implied for the benefit of the person paying consideration for the transfer to another person of legal title to real or personal property." O.C.G.A. § 53-12-131(a).

In contrast to a resulting trust, "[a] constructive trust is a trust implied whenever the circumstances are such that the person holding legal title to property, either from fraud or otherwise, cannot enjoy the beneficial interest in the property without violating some established principle of equity." O.C.G.A. § 53-12-132.

Georgia case law confirms that resulting trusts, rather than constructive trusts, are most analogous to the nominee lien framework. First, "'a constructive trust is a remedy created by a court in equity to prevent unjust enrichment' . . . [but] [u]njust enrichment . . . does not apply when the conferred benefit was a gift or voluntary payment." *Roberts v. Smith*, 801 S.E.2d 915, 921 (Ga. Ct. App. 2017)

14

(quoting *Reeves v. Newman*, 695 S.E.2d 626, 627 n.2 (Ga. 2010) and citing *Crook v. Foster*, 775 S.E.2d 286, 289 (Ga. Ct. App. 2015)).

Second, while the statute provides for the possibility of a constructive trust arising from fraud, O.C.G.A. § 53-12-132, the Government has disclaimed reliance on that theory. (Tr. 100:3–6) ("Now, Your Honor, the word 'fraud' has been mentioned a few times here today. But you'll notice that fraud is not a factor in this inquiry, nor is there any requirement that the taxpayer try to hinder a particular creditor.").

Finally, other bases for imposing a constructive trust, such as mistake of fact, *Matter of Vacuum Corp.*, 215 B.R. 277, 284–85 (Bankr. N.D. Ga. 1997), or breach of fiduciary duty, *Ray v. Hadaway*, 811 S.E.2d 80, 84 (Ga. Ct. App. 2018) do not map neatly to the nominee framework.

Therefore, purchase money resulting trusts, which as noted above are "implied for the benefit of the person paying consideration for the transfer to another person of legal title to real or personal property," seem most apt for the circumstances. O.C.G.A. § 53-12-131(a).[4]

---

[4] Indeed, the case that the Government relies on for the proposition in its trial brief "[t]hat a husband cannot shield his assets from his creditors by putting those assets in his wife's name has been long recognized in Georgia," involved a claim seeking the imposition of a resulting trust. (Trial Br. United States at 5, Doc. 57); *Jackson v. Faver*, 77 S.E.2d 728, 738 (Ga. 1953) ("A resulting trust which arises solely from the payment of the purchase price is not created, unless the purchase money is paid

Having determined the Georgia law framework applicable to nominee lien scenarios, the Court next turns to who bears the burden of proof under such a framework.

### D.   Burden of Proof

At the trial, the Court asked the parties about the applicable burden of proof. Both parties appeared to agree that as the party bringing the quiet title action, Mrs. Wilson bears the initial burden of proof. (Tr. 107:17–108:6). The statute and case law set forth certain baseline criteria a plaintiff must satisfy in such a case. Under O.C.G.A. § 23-3-42, a plaintiff must show the existence of a cloud on the title, which includes any "instrument which, by itself or in connection with proof of possession by a former occupant or other extrinsic facts, gives the claimant thereunder an apparent right in or to the property," and

> (1) That [the plaintiff] cannot immediately or effectually maintain or protect his rights by any other course of proceeding open to him;
>
> (2) That the instrument sought to be canceled is such as would operate to throw a cloud or suspicion upon his title and might be vexatiously or injuriously used against him;
>
> (3) That he either suffers some present injury by reason of the hostile claim of right or, though the claim has not

---

either before or at the time of the purchase.") (quoting *Hall v. Edwards*, 79 S.E. 852, 853 (Ga. 1913)).

16

been asserted adversely or aggressively, he has reason to apprehend that the evidence upon which he relies to impeach or invalidate the same as a claim upon his title may be lost or impaired by lapse of time.

O.C.G.A. § 23-3-42. Moreover, "it is 'the general rule * * * that, in order for a plaintiff to maintain an equitable petition to remove a cloud upon his title, he must allege and prove possession in himself.'" *Sweat v. Arline*, 197 S.E. 893, 896 (Ga. 1938) (quoting *Morris v. Mobley*, 155 S.E. 8, 11 (Ga. 1930)).

Assuming this initial burden is satisfied, when and whether it shifts to the holder of the challenged instrument depends on the circumstances of the case itself. For example, the Georgia Supreme Court has held that "'[w]here a deed, regular on its face, is attacked as invalid, the burden of proof rests on the person making such attack to establish the invalidity.' *Arrington v. Thompson*, 88 S.E.2d 402, 406 (1955) (citing 26 C.J.S., Deeds, § 190). "In a suit to recover land and to cancel a deed as a cloud upon the plaintiff's title, the burden is upon the plaintiff to make out such case as entitles him to the relief sought" *Id.* (quoting *Shelton v. Edenfield*, 96 S.E. 3, 4 (Ga. 1918)).

However, in a suit such as this one, it appears that the burden of proof is on the party seeking to establish the implied trust. *Bradley v. Thompson*, 44 S.E.2d 898, 902 (Ga. 1947) ("The uncontradicted evidence of the plaintiffs showing that paper title was in the name of the son, and that the son bought and paid for the land, the

burden was on the defendant to show that her husband paid for the land and caused title thereto to be taken in the name of his son.").

*Bradley* is instructive. In that case, a woman was sued on the grounds that she did not hold title to certain lots. The woman, in response, alleged that her ex-husband, Alonzo Bradley, purchased land in the name of his son, Earnest Bradley, and that "the latter did not pay any part of the purchase-price, did not claim to be the owner, and at all times held the legal title for the use and benefit of Alonzo Bradley" and "[i]t was at all times 'understood and agreed between the said Alonzo Bradley and Earnest Bradley that Earnest Bradley would convey the legal title to said Alonzo Bradley whenever he should so desire.'" *Id.* at 899–900. However, the woman contended that to avoid an alimony decree awarding the property to her from Alonzo, Earnest deeded away the land to a third party. *Id.* at 902. The Georgia Supreme Court affirmed a trial verdict against the woman, writing that "her evidence here failed to support the averments and showed only that the defendant's husband bought the material that went into the house, and that he took some of the defendant's money to help buy it." *Id.* Thus, even though the woman was effectively in the shoes of an innocent, third-party judgment creditor, she still bore the burden of showing facts to overcome the effect of record title.

Georgia statutory law also seems to support, in certain circumstances, placing the burden on the party claiming an interest in property through an implied trust. O.C.G.A. § 53-12-131, sets forth a framework for assessing the burden of proof for establishing a purchase money resulting trust:

> . . .
>
> (b) Except as provided in subsection (c) of this Code section, the payment of consideration as provided in subsection (a) of this Code section shall create a presumption in favor of a resulting trust, but such presumption shall be rebuttable by a preponderance of the evidence.
>
> (c) If the payor of consideration and transferee of the property as provided in subsection (a) of this Code section are husband and wife, parent and child, or siblings, a gift shall be presumed, but such presumption shall be rebuttable by clear and convincing evidence.

Under this framework, for a husband and wife, payment of the purchase price by one spouse and receipt of the property by another is presumed to be a gift, and the burden is on the party seeking to impose a resulting trust to rebut that presumption by clear and convincing evidence.

At trial, the Court asked the parties about this statute:

> THE COURT: All right. And one thing I looked at was I guess under Georgia law, if -- I'm looking at Code Section 53-12-131. And basically I read it to say that if there's a husband and wife and a payment between them, it's a gift and it shall be presumed, it's not -- that does not necessarily count as consideration for real property.

19

Are either of you familiar with that?

(Tr. at 110:11–16, Doc. 64). The Government responded as follows:

> MR. RILL: Yes, Your Honor. I've seen that code section. But here when we're -- this is why we're dealing with the nominee factors under federal common law; because Georgia law isn't particularly clear on the standards to be applied in these sorts of situations. And so that's why we look to the federal common law and the standards.

(*Id.* at 111:1–6).

In its trial brief, the Government invited the court to analogize the burden framework to a wrongful levy suit under IRC § 7426(a)(1), where there is "an initial burden on the taxpayer to show that he had title or some other ownership in the property and that the government had made a levy on that property because of a tax assessment against another taxpayer," and "after such a showing ha[s] been made by the taxpayer, the burden then shift[s] to the government to prove a nexus . . . between taxpayer and a third party by substantial evidence." *Morris v. United States*, 813 F.2d 343, 345 (11th Cir. 1987). "The plaintiff, however, retains the ultimate burden of proof of persuading the district court that the levy should be overturned." *Id.*

The Court rejects this invitation. "To resolve this dispute, the . . . court [is] required to look to Georgia law . . . , and Georgia law clearly provides that '[t]he burden of proving the existence of a resulting trust is on the party claiming to be the beneficiary of such a trust.'" *In re McFarland*, 619 F. App'x 962, 972–73 (11th

Cir. 2015) (citing *Musolino v. Sinnreich (In re Sinnreich)*, 391 F.3d 1295, 1297 (11th Cir. 2004) and quoting *Freeman v. Saxton*, 255 S.E.2d 28, 30 (Ga. 1979)). This is a quiet title action subject to Georgia law, not a wrongful levy suit.[5] The Eleventh Circuit's endorsement of federal common law as a gap-filling device does not entitle this Court to disregard clearly applicable Georgia statutory and case law.

That is not to say that, having identified the applicable burden of proof as a state law matter, federal common law plays no role in determining whether the burden is discharged.[6] Georgia law provides that "[c]ourts may consider all facts and circumstances surrounding the transaction to determine whether the parties intended a purchase money resulting trust." *In re McFarland*, 619 F. App'x 962, 968–69 (11th Cir. 2015) (citing O.C.G.A. § 53–12–133 and *Harrell v. Harrell*, 290 S.E.2d 906, 907 (Ga. 1982)). Consideration of the common law nominee ownership factors is plainly permissible under this broad framework. The Parties have briefed

---

[5] The distinction may ultimately be academic. Courts that have analogized the burden shifting framework appear to have held the Government to the state law burden of proof in the second step, reserving for the third step arguments about the validity of the Government's actions under federal laws and regulations. *See, e.g.*, *N. Country Escape, LLC v. United States*, 286 F. Supp. 3d 1025, 1039 (D. Minn. 2018) (citing *Scoville v. United States*, 250 F.3d 1198, 1201–02 (8th Cir. 2001)).

[6] Shifting the burden of demonstrating the nominee factors to the Government to rebut the gift presumption in cases involving spouses accords with the observation of several courts that "the nominee factors may be 'less probative' in cases of married couples, in terms of 'distinguishing tax shams from legitimate titling decisions between spouses.'" *May I*, 458 F. Supp. 2d at 1338 n.24 (quoting *Spotts v. United States*, 429 F.3d 248, 253 (6th Cir. 2005)).

and presented evidence and argument on these factors, which the Court considers in the following section.

## II.    Application of Law to Facts

As the Court explained above, in a quiet title action, the initial burden is on the plaintiff to show ownership, possession, and basic entitlement to the remedy. Joint Exhibit 11 is a Warranty Deed dated March 28, 2013 between Michael Larkin as Grantor and Patrice Wilson as Grantee (the "Deed"). The Deed was duly recorded on April 2, 2013 with the Clerk of the Superior Court of Clayton County. The Government does not identify any facial invalidity of the Deed due to lack of formality or insufficiency of legal description. *See* O.C.G.A. §§ 44-5-30, -33; *Allen v. Smith*, 150 S.E. 584, 586 (Ga. 1929); *see also Anthony v. Anthony,* 170 S.E.2d 273, 276–77 (Ga. Ct. App. 1969) ("The notarized, witnessed execution must be presumed to be valid in absence of evidence tending to rebut this presumption."). The evidence also shows Mrs. Wilson has possession of the Property, having lived there continuously since 2000. (Tr. 84–86).

The remaining factors of O.C.G.A. § 23-3-42 (enumerated above) are satisfied. Mrs. Wilson lacks an adequate remedy at law because she cannot bring an ejectment claim against the Government, as the Tax Lien is not a possessory interest. *See Vaughan v. Vaughan*, 317 S.E.2d 201, 203 (Ga. 1984). The Tax Lien constitutes a cloud upon the title because its validity depends on facts outside of

22

the face of the instrument. O.C.G.A. § 23-3-41.  The Tax Lien causes her a present injury because it "prevents [her] from disposing of" the Property. *Smith v. Burrus*, 76 S.E. 362, 363 (Ga. 1912). This is because, unless cancelled, it is "valid as against any purchaser" under I.R.C. § 6323.

Thus, the Court finds that Mrs. Wilson has met her initial burden in a quiet title case. Pursuant to O.C.G.A. § 53-12-131(c), the burden shifts to the Government to demonstrate that Mrs. Wilson held title for the benefit of Mr. Wilson by clear and convincing evidence.

The Government addressed the nominee factors in its closing argument. *See Wilkins*, 2019 WL 12518510, at *18. The first factor is whether the taxpayer exercised dominion and control over the property. *Id.* To address this factor, the Government points to Mr. Wilson's control over the Property prior to the transfer of the Property to Mrs. Wilson, including his placement of the Property into the Trust and arrangement of Mr. Larkin to purchase the Property. (Tr. 97:21–98:2). However, while his historical control over the Property may be probative of this factor, the relevant inquiry is whether Mr. Wilson has retained control over the Property since the alleged nominee has taken title. *See Wilkins*, 2019 WL 12518510, at *20 ("Lawrence Wilkins exercises virtually exclusive dominion and control over the Malton Street Property . . . Lawrence Wilkins also exercises exclusive dominion and control over the Bliffert Street Property."). While the Court heard evidence

that the Property was Mr. Wilson's home (Tr. 95:13–25), and that he organized renovations of the Property without Mrs. Wilson's pre-approval (*Id*. 59:17–23), there was no evidence that Mr. Wilson ever exercised complete dominion and control over the Property to the exclusion of Mrs. Wilson. This factor does not favor the Government.

The second factor is whether the property of the taxpayer was placed in the name of the nominee in anticipation of collection activity. *Wilkins*, 2019 WL 12518510, at *18. There is no dispute that the taxes giving rise to the Tax Lien in this case did not arise until after the transfer to Mrs. Wilson. (Stip. ¶¶ 1, 7, 8). While the Government does not have to show that the Property was transferred in anticipation of collection activity for the *taxes*, the absence of any taxes due or any other substantial debts other than the mortgage debt which Mr. Wilson was purportedly evading casts doubt on this factor. The Government points to the pendency of the foreclosure as collection activity, but the mortgage creditor could resort to foreclosure regardless of who held title to the property. In the Court's understanding, this factor is more concerned with transfers intended to hinder, delay, or defraud creditors, which was not shown in this case. Thus, this factor does not favor the Government.

The third factor is whether the purported nominee paid any consideration for the property, or whether the consideration paid was inadequate. *Wilkins*, 2019

WL 12518510, at *18. The Government argues that Mrs. Wilson paid inadequate consideration because the short sale price was a fraction of the original price Mr. Wilson paid. However, the Court heard testimony that there was an appraisal done on the Property prior to the short sale, and there was no evidence presented that the sale price was less than the fair market value at the time of the sale. (Tr. 24:10). Mrs. Wilson took out a mortgage to pay the vast majority of the sale price, and the incurring of an obligation is consideration. *See* O.C.G.A. § 13-3-42. Mr. Wilson submitted a gift letter stating he would provide $5,000 toward the purchase price. However, the evidence was unclear as to whether this money was actually used toward the purchase. Even if it was, this amount is far less than the purchase price of $110,000. (Stip ¶ 7). This factor does not favor the Government.

The fourth factor is whether a close relationship exists between the taxpayer and the nominee. *Wilkins*, 2019 WL 12518510, at *18. This factor is undisputed, and favors the Government.

The final factor is whether the taxpayer pays the expenses (mortgage, property taxes, insurance) directly, or is the source of the funds for payments of the expenses. *Id*. There was conflicting evidence on this point. The Government points to the consistent payments of approximately $1,500 per month since 2015 and the approximately $40,000 in repairs paid for by Mr. Wilson. (Tr. 32:9–18; J.E. 12; Tr. 27:14–19; J.E. 13–19). As an initial matter, these amounts are not purchase

money, so under Georgia law, they do not in and of themselves create a resulting trust. *Hall v. Edwards*, 79 S.E. 852, 853 (Ga. 1913)) ("Trusts implied from the payment of the purchase money or a part thereof must result, if at all, at the time of the execution of the conveyance."). But, to the extent that these payments are probative of the Wilsons' intent as to who the true owner of the property is, the evidence on this point is inconclusive. Mrs. Wilson testified that she pays the mortgage and other property expenses, including renovations, from her own funds. (Tr. 79:16–20; 93:6–15). The Wilsons both testified credibly that the $1,500 per month was not earmarked for payment of the mortgage, and that Mr. Wilson was under no legal (as opposed to moral) obligation to pay the amounts. (*Id.* 33:9–17; 89:7–90:15). Thus, this factor does not favor the Government.

Having reviewed the foregoing, the Court finds that the Government has failed to rebut the statutory presumption against the imposition of a resulting trust between spouses under Georgia law. O.C.G.A. § 53-12-131(c).

Moreover, the Court notes that even if Mrs. Wilson had the burden of showing that she was the true owner of the property free and clear of any nominee relationship, she would have met her burden by a preponderance of evidence. She remained in continuous possession of the Property, she alone incurred the purchase money mortgage to purchase the Property, and she paid the Property expenses from her own bank account. When the Court asked the Government "[i]f

26

Ms. Wilson . . . owed money to the IRS, would the IRS be able to put a lien on this house?", the Government equivocated, explaining that

> if Mrs. Wilson had a tax liability, it would attach to whatever property interests she would have, which based on plaintiff's arguments would be in this property. Similarly that's why we're here today; because the IRS has a lien on all rights to property of Mr. Wilson's, which includes his interest in the subject property.

(Tr. 109:8–21). While this was a correct statement of law, the uncertainty it engenders exposes the major flaw in the Government's case: it is not clear what more Mrs. Wilson could have done to protect her ownership from her husband's tax debts other than excluding Mr. Wilson from the Property and refusing to allow him to contribute to the household expenses. In the interest of "fostering the harmony and sanctity of the marriage relationship," the Court declines to require spouses already filing taxes separately to take these sorts of precautionary actions. *Trammel v. United States*, 445 U.S. 40, 44 (1980) (discussing the historical underpinnings of the spousal privilege doctrine).

## Conclusion

This is not an enforcement proceeding by the Government under the Internal Revenue Code or the Federal Debt Collection Practices Act. This is a quiet title proceeding governed by Georgia law. The Eleventh Circuit has made clear that absent some provision of law requiring otherwise, the IRS is treated the same as any other party in civil litigation. *United States v. Stein*, 881 F.3d 853, 857 (11th

Cir. 2018) ("We apply the same summary judgment standard in tax cases as we do in other areas of law."). The Court recognizes that a nominee lien framework that differs state-by-state will lead to complexity. But just because an area of state law is esoteric does not mean that the Government can throw up its hands and claim that federal common law must be resorted to. *Spotts v. United States*, 429 F.3d 248, 254 (6th Cir. 2005) (vacating district court for failing to give "appropriate deference to Kentucky law" in nominee lien case).

For the foregoing reasons, the Court finds for the Plaintiff. Judgment will enter accordingly.

**SO ORDERED** this 5th day of December, 2022.

Victoria Marie Calvert
United States District Judge